928 F.2d 428
 289 U.S.App.D.C. 16
 AERONAUTICAL RADIO, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Skylink Corporation, Transit Communications, Inc., Hughes
Communications Mobile Satellite Services, Inc.,
Mobile Satellite Corporation, American
Mobile Satellite Corporation,
Intervenors.
GLOBESAT EXPRESS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION, Respondent,
Skylink Corporation, Hughes Communications Mobile Satellite
Services, Inc., Global Land Mobile Satellite, Inc., Transit
Communications, Inc., Mobile Satellite Corporation, McCaw
Space Technologies, Inc., American Mobile Satellite
Corporation, Intervenors.
GLOBESAT EXPRESS, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Aeronautical Radio, Inc., Air Transport Association of
America, Geostar Messaging Corporation, MTel Space
Technologies Corporation, American Mobile Satellite
Corporation, Hughes Communications Mobile Satellite
Services, Inc., Intervenors.
GLOBAL LAND MOBILE SATELLITE, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Aeronautical Radio, Inc., Air Transport Association of
America, MTel Space Technologies Corporation, Hughes
Communications Mobile Satellite Services, Inc., American
Mobile Satellite Corporation, Intervenors.
GLOBAL LAND MOBILE SATELLITE, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Aeronautical Radio, Inc., Air Transport Association of
America, MTel Space Technologies Corporation, Hughes
Communications Mobile Satellite Services, Inc., American
Mobile Satellite Corporation, Intervenors.
MOBILE SATELLITE SERVICE, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Aeronautical Radio, Inc., Air Transport Association of
America, Geostar Messaging Corporation, Hughes
Communications Mobile Satellite Services, Inc., American
Mobile Satellite Corporation, Intervenors.
AERONAUTICAL RADIO, INC., et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Appellees,
Geostar Messaging Corporation, American Mobile Satellite
Corporation, MTel Space Technologies Corporation,
Hughes Communications Mobile Satellite
Services, Inc., Intervenors.
AERONAUTICAL RADIO, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Appellees,
American Mobile Satellite Corporation, Hughes Communications
Mobile Satellite Services, Inc., MTel Space
Technologies Corporation, Intervenors.
AERONAUTICAL RADIO, INC., et al. Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Mobile Satellite Corporation, Geostar Messaging
Corporation, MTel Space Technologies Corporation,
Hughes Communications Mobile Satellite
Services, Inc., Intervenors.
AERONAUTICAL RADIO, INC., et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Mobile Satellite Corporation, Geostar Messaging
Corporation, Hughes Communications Mobile
Satellite Services, Inc., MTel Space
Technologies Corporation, Intervenors.
 Nos. 88-1009, 88-1855, 89-1526 to 89-1529, and 89-1540 to 89-1543.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 14, 1990.
Decided March 19, 1991.
Rehearing En Banc Denied
in No. 88-1009 May 30, 1991.
 
 On Petitions for Review of and Appeals from Orders of the Federal Communications Commission.
 John L. Bartlett, with whom William B. Baker and Carl R. Frank, Washington, D.C., for Aeronautical Radio, Inc., and James E. Landry, Washington, D.C., for Air Transport Ass'n of America, were on the joint brief, for Aeronautical Radio, Inc., petitioner/appellant in 88-1009, 89-1540, 89-1541, 89-1542 and 89-1543 and intervenor in 89-1526, 89-1527, 89-1528 and 89-1529, and for Air Transport Ass'n of America, petitioner/appellant in 89-1540, 89-1542 and 89-1543 and intervenor in 89-1526, 89-1527, 89-1528 and 89-1529.
 Michael J. Hirrel, with whom J. Geoffrey Bentley was on the joint brief, Washington, D.C., for Global Land Mobile Satellite, Inc., petitioner/appellant in 89-1527 and 89-1528 and intervenor in 88-1855 and for Globesat Express, petitioner/appellant in 88-1855 and 89-1526.
 Roberta L. Cook, Counsel, F.C.C., with whom John E. Ingle, Deputy Associate Gen. Counsel, C. Grey Pash, Jr., and Gregory M. Christopher, Counsel, F.C.C., and James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan and Robert J. Wiggers, Attys., U.S. Dept. of Justice, were on the brief, Washington, D.C., for respondents in 88-1009, 88-1855, 89-1526, 89-1527, 89-1528, 89-1529, 89-1540, 89-1541, 89-1542 and 89-1543.
 William E. Zimsky was on the brief, New Orleans, La., for Mobile Satellite Service Corp., Inc., appellant in 89-1529.
 Lon C. Levin, with whom Louis Gurman, Glenn S. Richards, Richard R. Zaragoza, Bruce D. Jacobs, Leonard H. Becker, and Jeffrey Kirchmeier, Washington, D.C., for American Mobile Satellite Corp.
 Richard A. Zaragoza, with whom Bruce D. Jacobs, Washington, D.C., for Mobile Satellite Corp.
 Neal M. Goldberg, Washington, D.C., for Skylink Corp.
 Steven P. Goldman, Washington, D.C., for McCaw Space Technologies, Inc.
 Thomas Gutierrez, Washington, D.C., for MTel Space Technologies Corp.
 James F. Rogers, Washington, D.C., for Hughes Communications Mobile Satellite Service, Inc.
 Andrew D. Lipman, Washington, D.C., for Transit Communications, Inc., were on the joint brief for intervenors in all cases.
 John W. Pettit, Washington, D.C., also entered an appearance for intervenor
 Skylink Corp.
 William D. Freeman, Washington, D.C., also entered an appearance for intervenor American Mobile Satellite Corp.
 Gary M. Epstein, Washington, D.C., also entered an appearance for intervenor Hughes Communications Mobile Satellite Services, Inc.
 David D. Oxenford, Washington, D.C., also entered an appearance for intervenor Mobile Satellite Corp.
 Rhonda P. Kurtis, also entered an appearance for intervenor McCaw Space Technologies, Inc.
 Daniel Van Horn, Washington, D.C., also entered an appearance for petitioner and intervenor Global Land Mobile Satellite, Inc.
 James G. Ennis, Washington, D.C., entered an appearance for intervenor Geostar Messaging Corp.
 Before EDWARDS, BUCKLEY and WILLIAMS, Circuit Judges.
 
 
 1
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 
 TABLE OF CONTENTS
 I. INTRODUCTION
 II. BACKGROUND
 A. The Frequency Allocation Decisions
 
 2
 B. The Ownership and Financial Requirements Rules
 
 III. DISCUSSION
 
 3
 A. ARINC's Challenges to the Rulemaking Proceeding
 
 
 4
 1. The Commission's Rejection of ARINC's Application Without a Hearing
 
 
 5
 a. The Ashbacker Doctrine
 
 
 6
 b. The Dismissal of ARINC's Application for Non-Compliance with the Commission's Spectrum Allocation Rules
 
 
 7
 c. Notice Concerning the Scope of the MSS Cut-Off Date
 
 
 8
 2. The Commission's Spectrum Allocation Rules
 
 
 9
 a. The Exclusion of APC from AMSS(R)
 
 
 10
 b. The Shared Allocation Scheme
 
 
 11
 B. The MSS Petitioners' Challenges to the Rulemaking Proceeding
 
 
 12
 1. The $5 Million Dollar Cash Contribution Rule
 
 
 13
 a. Notice of the Rule
 
 
 14
 b. The Validity of the Rule
 
 
 15
 2. The Legality of a Mandatory Consortium in Lieu of Comparative Hearings
 
 
 16
 a. The Standing of the MSS Petitioners
 
 
 17
 b. Notice of the Consortium Rule
 
 
 18
 c. The Legality of the Consortium Rule
 
 IV. CONCLUSION
 HARRY T. EDWARDS, Circuit Judge:
 I. INTRODUCTION
 
 19
 This case involves several challenges, brought by various petitioners/appellants, to rulemaking and licensing decisions rendered by the Federal Communications Commission ("Commission"), in connection with a new mobile communications system known as mobile satellite service ("MSS").
 
 
 20
 In a Notice of Proposed Rulemaking ("NPR") issued in 1985, the Commission proposed to allocate spectrum to MSS which previously had been allocated to another service, known as Aeronautical Mobile Satellite Service ("AMSS(R)"); in suggesting this arrangement, the Commission pledged that any reallocation would take into account the communication needs intended to be met through AMSS(R). The Commission further expressed the view that, in establishing MSS, a multi-ownership system would best serve the public interest; accordingly, the Commission sought comments on a consortium approach to MSS licensing. The NPR also indicated that MSS applicants, in order to be considered for licensing, would be obligated to meet certain financial eligibility requirements.
 
 
 21
 Following notice and comment on the NPR, the Commission adopted a frequency allocation which permitted shared use of spectrum by MSS and AMSS(R) providers; the allocation also allowed MSS licensees to provide services formerly designated for the AMSS(R) system. The Commission further determined that, rather than select a single licensee, it would award the MSS license to a consortium consisting of all qualified and interested applicants. Membership in the consortium was made contingent upon a $5 million cash contribution; any money thus contributed was to be used to pay expenses associated with the start-up costs of the MSS system. Subsequently,, a consortium was organized and authorized to provide both MSS and AMSS(R) services.
 
 
 22
 During the course of the foregoing proceedings before the Commission, Aeronautical Radio, Inc. ("ARINC"), one of the petitioners in this case, applied for a license to provide service pursuant to a separate AMSS(R) system. The Commission dismissed ARINC's proposal as contrary to application rules established in connection with the mobile satellite service system. ARINC now argues that, because its application was mutually exclusive with the consortium application which the Commission ultimately granted, the Commission erred in denying it a comparative hearing on the merits of its application. ARINC also claims that the rules pursuant to which the Commission dismissed its application, as well as those allowing the MSS licensee to provide all AMSS(R) services, were arbitrary and capricious.
 
 
 23
 Global Land Mobile Satellite, Inc. ("Global") and Globesat Express ("Globesat"), joined by Mobile Satellite Service, Inc. ("MSSI"), all of whom are also petitioners in this case, are here challenging the Commission's dismissal of their applications for failure to contribute $5 million in cash to the consortium. These petitioners assert that the $5 million cash contribution requirement should be struck down as arbitrary and capricious. They further claim that the Commission's decision to award the MSS license to a consortium, in lieu of selecting a licensee through comparative hearings, violates the Commission's statutory obligations to hold comparative hearings when faced with mutually exclusive applications. Alternatively, these petitioners argue that the NPR was defective because it failed to provide adequate notice of the possibility of either the consortium arrangement or the $5 million cash contribution rule.
 
 
 24
 On the record before us, we deny ARINC's appeals and petitions for review and grant the appeals and petitions filed by Global, Globesat and MSSI. First, we agree with the Commission that ARINC was not entitled to a comparative hearing because its application did not comply with the Commission's rules with respect to applications. Second, we reject ARINC's challenges to the Commission's rules themselves, finding that these rules are both well within the Commission's authority and fully justified. Finally, we reverse the Commission's dismissals of Global's, Globesat's and MSSI's applications, finding no reasoned justifications for the agency's decisions requiring applicants to demonstrate financial ability through a $5 million cash deposit and imposing consortium-licensing in lieu of comparative hearings. Accordingly, we remand the case to the Commission for further consideration.
 
 II. BACKGROUND
 
 25
 In November 1982, the National Aeronautics and Space Administration ("NASA") petitioned the Commission for rulemaking for the establishment of a MSS system.[1] MSS is a radio communications service that employs satellites to relay radio signals to and from mobile units. NASA's specific proposal contemplated a "land" MSS system providing communications to and from vehicles such as cars, trucks and ambulances; however, maritime and aeronautical mobile satellite services, involving communications to and from ships and airplanes, also may be provided through MSS technology.
 
 
 26
 Unlike terrestrial mobile communications services, which employ antenna towers to relay radio signals, MSS is both terrain-and distance-insensitive. As a result, it can provide service which is not dependent upon the stability of earth-bound transmitters, and can reach inaccessible or low-density areas which would not ordinarily be served by terrestrial systems.[2]
 
 
 27
 The Commission received numerous comments in response to NASA's proposal, as well as two applications for developmental MSS licenses. The majority of these submissions indicated that a MSS system would serve the public interest by significantly expanding the breadth of mobile communications service. Accordingly, the Commission issued a Notice of Proposed Rulemaking proposing to allocate frequencies and to adopt licensing procedures for the establishment of MSS.[3]
 
 
 28
 The challenges now brought by ARINC, on the one hand, and Global, Globesat and MSSI ("the MSS petitioners"), on the other, involve two distinct aspects of the MSS rulemaking proceedings which followed the issuance of the NPR. ARINC's appeals and petitions object to certain of the Commission's frequency allocation decisions, while the MSS petitioners challenge the ownership and financial eligibility rules adopted by the Commission.
 
 A. The Frequency Allocation Decisions
 
 29
 In the NPR, the Commission proposed to allocate certain frequencies from the UHF band to the new MSS system. Since there was insufficient UHF spectrum available to meet the anticipated demands of a fully-developed MSS system, the Commission also proposed to reallocate some spectrum in the L-Band for MSS use.[4] At the time of the MSS rulemaking, most of the L-Band frequencies were allocated to AMSS(R), to provide "communications to support domestic and international air traffic, including air traffic control (ATC)."[5] However, an AMSS(R) system never had been organized and the frequencies allocated to it had lain fallow. The Commission thus decided to examine the magnitude of aviation needs for the L-Band spectrum and to reallocate to the MSS system whatever frequencies were not required for AMSS(R).[6]
 
 
 30
 The Commission suggested that the provision of both land mobile satellite services and AMSS(R) in the L-Band could be implemented in one of two ways: either the L-Band frequencies could be divided, with some being allocated to an AMSS(R) system and the rest to a land MSS system, or aeronautical mobile and land mobile services could be provided by the same licensee, obviating the need for a separate allocation for AMSS(R) in the L-Band.
 
 
 31
 The Commission gave notice that all applications for a MSS license had to be submitted by March 29, 1985--60 days from the release date of the NPR.[7] Subsequently, ARINC indicated interest in launching a satellite-based aeronautical communications system, and sought assurance from the Commission that the MSS application cut-off date would not be applied to applications for a dedicated aeronautical satellite system.[8] A Commission official confirmed that the Commission's cut-off date applied only to MSS applications, and that applications for a dedicated AMSS(R) system could be submitted after that cut-off.[9] ARINC had notice, however, that the Commission intended to establish spectrum allocations in the MSS rulemaking that might limit the design of any AMSS(R) system that ARINC might later propose.
 
 
 32
 After reviewing numerous comments submitted in response to the NPR, the Commission issued its frequency allocation decision as part of an omnibus allocation order.[10] A number of comments had reinforced the Commission's earlier assessment that a MSS system would serve the public interest. However, many proponents of terrestrial mobile communications systems had objected to the Commission's proposed allocation of UHF frequencies to a new satellite system, arguing that those frequencies were necessary to meet burgeoning terrestrial mobile communications needs. In light of this significant expression of interest in the use of UHF frequencies for other services, the Commission decided to locate MSS entirely in the L-Band. To that end, the Commission reallocated 27 of the 28 MHz[11] which had been allocated to AMSS(R), as follows: nine MHz remained allocated to AMSS(R) on a primary basis, with MSS use to be permitted on a secondary basis,[12] while 18 MHz were designated for shared use by MSS and AMSS(R) on a co-primary basis.
 
 
 33
 The Commission stated that AMSS(R) would have top-priority status even in the 18 MHz allocated to MSS and AMSS(R) on a co-primary basis. Thus, AMSS(R) communications would take precedence over MSS throughout the entire 27 MHz of L-Band frequencies affected by the Allocation Order. The Commission also stated that, while separate MSS and AMSS(R) systems might be required, it now envisioned that "shared-service satellites ... [would] provide both generic MSS and dedicated aeronautical functions."[13]
 
 
 34
 On April 14, 1987, ARINC submitted a license application for an AMSS(R) system in the L-Band. ARINC offered to provide a variety of aviation communications services, including air traffic control, aircraft operational control, emergency transmissions, aeronautical administrative communications and aircraft passenger communications. To implement its proposal, ARINC requested use of three of the nine MHz which, under the Commission's reallocation scheme, had remained allocated exclusively to AMSS(R) on a primary basis, plus 11 MHz of spectrum which had been allocated to AMSS(R) and MSS on a co-primary basis.
 
 
 35
 The Commission dismissed ARINC's application, principally for failing to conform with the Commission's spectrum allocation decisions.[14] First, the Commission noted that ARINC had requested that 11 MHz allocated to MSS and AMSS(R) on a shared-use basis be awarded to a system dedicated solely to aviation-related services. Before such a request could be considered, the Commission stated, ARINC would need to demonstrate that the 10 MHz of frequencies which were allocated exclusively to AMSS(R) on a primary basis were somehow inadequate to satisfy aviation needs, and that ARINC would be able to share the co-primary frequencies it had requested with a separate MSS licensee. The Commission found that ARINC had made neither showing. Second, the Commission noted that ARINC had proposed to include air passenger communications ("APC") in its AMSS(R) system.[15] The Commission stated that such non-safety-related services could not be offered under the AMSS(R) classification.
 
 
 36
 Accordingly, the Commission dismissed ARINC's application without prejudice, indicating that ARINC could submit a future AMSS(R) application in conformity with the Commission's prior orders concerning the provision of satellite services. ARINC, however, chose not to submit another AMSS(R) application. Instead, ARINC petitioned the Commission for reconsideration and reinstatement of its original application and for reconsideration of the rules established in the Allocation Order. The Commission denied each of these requests,[16] and ARINC's present appeals and petitions followed.
 
 
 37
 B. The Ownership and Financial Requirements Rules
 
 
 38
 In the NPR, the Commission invited applications for authority to construct, launch and operate a MSS system. The NPR also revealed the Commission's intention to authorize only one entity to operate that system. In the Commission's view, the high costs of launching the system, the then-prevailing state of satellite technology and the need to coordinate MSS with the satellite systems of foreign countries militated in favor of the selection of a single licensee.[17] The NPR thus proposed a multi-ownership arrangement as the best method to accommodate the perceived need for a single licensee with the desire to maximize participation in the provision of the new service. The NPR invited comments on the desirability of a consortium approach to MSS licensing, the possible structure of such a consortium and whether the consortium ownership approach should be mandatory.[18] Finally, the NPR directed potential applicants to provide estimates of the costs of constructing, launching and operating a MSS system for one year, and to demonstrate their financial ability to meet those costs.[19]
 
 
 39
 After reviewing the comments submitted in response to the NPR, the Commission decided that the MSS license would be awarded to a consortium comprised of all willing and qualified applicants.[20] The Commission rejected several licensing alternatives, including the holding of comparative hearings.[21] The Commission found that such hearings would be costly and time-consuming, and would delay the provision of MSS to the public. Moreover, given the innovative nature of the services involved and the complex technological, commercial and financial considerations relevant to the suitability of a MSS applicant, the Commission speculated that making a valid comparison between satellite system applications would be extremely difficult. Finally, the Commission theorized that, because satellite technology was evolving at such a frantic pace, any individual system proposal which it might approve could well be rendered impractical or obsolete by advances made after the application was submitted. The Commission found that a consortium licensee would have greater flexibility to adapt its system design to new technological developments.
 
 
 40
 The Commission required each applicant seeking consortium membership to make a $5 million cash deposit to an escrow account to demonstrate its financial ability to support the operation of the MSS system. The $5 million amount was based upon the Commission's estimate that at least four applicants would join the consortium and that pre-operational expenses would approximate $20 million.[22] Parties not making the required contribution by April 13, 1987, the Commission warned, would be dismissed for non-compliance with the Commission's eligibility requirements.[23]
 
 
 41
 After several applicants objected to the Commission's requirement that they tie up $5 million in a low-interest escrow account, the Commission's Common Carrier Bureau ("Bureau") issued an order modifying the contribution rule to allow letters of credit and performance bonds to be submitted in lieu of cash deposits.[24]
 
 
 42
 The applicants were subsequently unable to come to terms on a single joint operating agreement. Instead two separate applications were submitted, one filed jointly by a group of seven applicants, the other by a group of two.[25] The Bureau rejected both applications as contrary to the Commission's expressed intent to authorize a single consortium comprised of all willing and financially eligible applicants.[26] However, the Bureau credited several applicants' allegations that their inability to reach a joint agreement stemmed from their concerns about the financial qualifications of some would-be consortium members. The Bureau deemed it necessary to eliminate such doubts, but expressed a disinclination to resolve questions of financial qualification through comparative hearings, stating that such a course would be unduly costly and time-consuming. Instead, the Bureau opted for a prophylactic solution, reinstating its requirement that all applicants wishing to participate in the consortium contribute $5 million in cash. The Bureau expressed its belief that requiring strict compliance with the cash contribution rule would remove any doubts concerning finances among the applicants and would expedite the formation of a joint agreement.
 
 
 43
 The Bureau stated that applicants would be given eight days, from the date of the agency's order, to deposit the requisite funds.[27] Global, Globesat and MSSI failed to meet this deadline, and the Bureau dismissed their applications.[28] The remaining MSS applicants thereupon entered into an agreement to form American Mobile Satellite Corporation ("AMSC") as the MSS consortium. AMSC agreed to provide both MSS and AMSS(R) services on the same system.
 
 
 44
 On August 4, 1989, the Commission authorized AMSC to construct, launch and operate a mobile satellite system providing common carrier communications services.[29] That same day, the Commission issued an order rejecting Global's, Globesat's and MSSI's requests for reconsideration and review of the various ownership and financial requirements rulings promulgated throughout the proceedings.[30] These applicants then filed the present appeals and petitions.III. DISCUSSION
 
 
 45
 A. ARINC's Challenges to the Rulemaking Proceeding
 
 
 46
 ARINC presents two challenges to the Commission's rulemaking decisions. First, ARINC contends that, under Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), the Commission could not dismiss its proposal and grant that of AMSC without holding a comparative hearing on what ARINC perceives to be mutually exclusive applications. Second, ARINC argues that the rules promulgated by the Commission during the licensing proceeding were arbitrary and capricious. In particular, ARINC contends that the Commission's exclusion of air passenger communications, or APC, from AMSS(R) is inconsistent with the Commission's established policy of allowing license applicants to offer all services technically consistent with their licenses, and that the Commission's allocation of L-Band spectrum for MSS use violates an international treaty governing spectrum allocation.
 
 
 47
 1. The Commission's Rejection of ARINC's Application Without a Hearing
 
 
 48
 a. The Ashbacker Doctrine
 
 
 49
 Section 309(a) of the Communications Act, 47 U.S.C. Sec. 309(a) (1988), provides that the Commission "shall grant" a license application if the Commission finds, upon examination of the application, that the public interest, convenience and necessity will be served by such a grant. When mere examination of the application does not support a finding that the proposal will serve the public interest, section 309(e), 47 U.S.C. Sec. 309(e) (1988), provides that the Commission "shall ... designate the application for hearing."
 
 
 50
 In Ashbacker, the Supreme Court considered the interrelationship of sections 309(a) and 309(e) where the Commission is presented with two mutually exclusive license applications. The Court recognized that, in such a situation, a section 309(a) grant of one application without a hearing effectively rendered any subsequent hearing on the second applicant's proposal a rehearing on the grant of its competitor's license, rather than a hearing on the merits of its own application. Such a procedure, the Court concluded, made the second applicant's section 309(e) right to a pre-dismissal hearing "an empty thing." Ashbacker, 326 U.S. at 330, 66 S.Ct. at 150. The Court thus held that, "where two bona fide applications are mutually exclusive the grant of one without a hearing to both" is improper. Id. at 333, 66 S.Ct. at 151. ARINC now contends that, by granting AMSC's application and dismissing ARINC's without holding a comparative hearing on the two proposals, the Commission ignored the teachings of Ashbacker.
 
 
 51
 ARINC's argument is fundamentally misguided. Ashbacker involved the interplay between sections 309(a) and 309(e) when two mutually exclusive and bona fide applications are simultaneously pending before the Commission. The Court recognized that, in such cases, a section 309(a) grant of an application without a hearing results in an approval of the application granted and a rejection of all pending applications with which it is mutually exclusive. Thus, the causal link between the grant of one application without a hearing and the de facto denial of another prior to hearing is central to the Ashbacker holding. No such link is present in this case.
 
 
 52
 ARINC's application was not denied as a consequence of the Commission's grant of AMSC's application without a hearing. To the contrary, the Commission rejected ARINC's application because it was inconsistent with the Commission's spectrum allocation orders, and this rejection came a full two years before the MSS license was awarded to AMSC.[31] ARINC's proposal thus failed entirely on its own terms, and there is simply no nexus between the Commission's grant of AMSC's application and its denial of ARINC's application. Accord ingly,, Ashbacker has no relevance to the dismissal of ARINC's proposal.
 
 
 53
 b. The Dismissal of ARINC's Application for Non-Compliance with the Commission's Spectrum Allocation Rules
 
 
 54
 The mere fact that Ashbacker is not pertinent, of course, does not mean that ARINC was not entitled to a hearing on its application; as noted above, section 309(e), of its own force, may entitle a license applicant to a hearing before its application may be dismissed.
 
 
 55
 As the Supreme Court has recognized, however, the right to a hearing created by section 309(e) is not absolute. Thus, in United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956), the Court stated:
 
 
 56
 We do not read the hearing requirement ... as withdrawing from the power of the Commission the rulemaking authority necessary for the orderly conduct of its business....
 
 
 57
 ....
 
 
 58
 ... We do not think Congress intended the Commission to waste time on applications that do not state a valid basis for a hearing.
 
 
 59
 Id. at 202, 205, 76 S.Ct. at 770, 771. It is thus clear that the Commission may reject, without a hearing, applications which do not meet valid eligibility requirements. See, e.g., Hispanic Information & Telecommunications Network, Inc. v. FCC, 865 F.2d 1289, 1294 (D.C.Cir.1989) (section 309(e) "does not preclude the FCC from establishing threshold standards to identify qualified applicants and excluding those applicants who plainly fail to meet the standards"); Guinan v. FCC, 297 F.2d 782, 785 (D.C.Cir.1961) (no comparative hearing necessary "once it has been established that one of the competing applicants is basically unqualified"); Ranger v. FCC, 294 F.2d 240, 242-43 (D.C.Cir.1961) (where application fails in material respects to comply with Commission rules, agency can reject application without hearing). In the present case, the Commission dismissed ARINC's application on the grounds that it was "clearly inconsistent" with the rules established by the Commission for satellite system applicants in the NPR and Allocation Order.[32] We therefore direct our inquiry to whether this conclusion was justified.
 
 
 60
 The NPR revealed the Commission's two-fold goal of authorizing a viable MSS system while at the same time meeting aeronautical needs for mobile satellite communications. After notice and comment, the Commission determined in the Allocation Order that the best way to accomplish these dual objectives, and thus best serve the public interest, was to adopt a shared allocation of spectrum between AMSS(R) and MSS. The Commission concluded that a shared allocation system would provide "incentives to commercial operators to develop services useful for both land mobile and aeronautical mobile purposes."[33] "While certain separate aeronautical systems may be required," the Commission explained, "we envision shared service satellites to provide both generic MSS and dedicated aeronautical functions."[34]
 
 
 61
 The AMSS(R) application that was subsequently submitted by ARINC was fundamentally at odds with this shared allocation scheme. ARINC did not propose a shared-service satellite system providing both generic MSS and dedicated AMSS(R) service, but instead offered to provide aeronautical services exclusively. This alone, of course, would not have rendered ARINC's application defective, since the Allocation Order had left open the possibility that the Commission might license a separate AMSS(R) system. However, the specifics of ARINC's AMSS(R) proposal revealed it to be completely incompatible with the overall spectrum allocation scheme adopted by the Commission.
 
 
 62
 Although the Commission had allocated 10 MHz of frequencies for AMSS(R)'s exclusive primary use, ARINC's aviation communications-only system was designed to occupy many of the frequencies intended for shared MSS/AMSS(R) use. Moreover, ARINC did not suggest that it would be feasible for it to share the use of these frequencies with a separate MSS applicant, leading the Commission to the inevitable conclusion that ARINC's plan would greatly reduce the spectrum available for the MSS provider. Yet, ARINC never demonstrated that aeronautical needs militated in favor of such a severe restriction on MSS capabilities. In short, the ARINC proposal effectively disregarded the MSS-licensing proceedings and the rules associated therewith. Consequently, the Commission properly found ARINC's application to be antagonistic to the basic purpose for which the rulemaking proceedings had been initiated, i.e., the licensing of a system or systems that would make maximum use of available spectrum and enable both generic MSS and dedicated AMSS(R) needs to be satisfied to the fullest possible extent.[35]
 
 
 63
 In addition, ARINC's application improperly called for the provision of APC service as part of an AMSS(R) system. In the Allocation Order, the Commission had emphasized that AMSS(R) was a satellite service "reserve[d] for aeronautical communications of enroute flights related to safety and regularity of flight."[36] The safety-related nature of AMSS(R) was, in fact, the justification the Commission gave in the Allocation Order for its being accorded top-priority access to the L-Band; in a reference to APC, the Commission used the term "non-AMSS(R)" to describe "aeronautical communications that may not be safety-related and which ... [would] accordingly" not merit top-priority status.[37] By including APC in its AMSS(R) proposal, ARINC simply ignored the Commission's determination that APC could not be offered under the AMSS(R) classification.
 
 
 64
 For all of the foregoing reasons, we find that the Commission acted well within its discretion in finding that ARINC's proposal was discordant with its application rules, and hence not entitled to further consideration.
 
 
 65
 c. Notice Concerning the Scope of the MSS Cut-Off Date
 
 
 66
 Having determined that ARINC's AMSS(R) proposal was properly found in violation of the Commission's rules concerning AMSS(R) applications, we can quickly dispose of ARINC's strained contention that the Commission improperly denied it consideration as a MSS applicant. ARINC argues that, when its application was dismissed, the Commission indicated for the first time that the MSS licensee would be the exclusive provider of APC service and might also be allowed to offer all aeronautical mobile satellite services in a shared MSS/AMSS(R) system. ARINC thus contends that the proposal it submitted for an AMSS(R) system was consistent with the Commission's land MSS application requirements. Indeed, ARINC goes further and suggests that if its application had been submitted pursuant to the MSS cut-off date, the Commission would have been required to accord that application comparative consideration with other MSS proposals. From this misguided perspective, ARINC makes the extraordinary claim that the Commission improperly dismissed its application for failure to meet the deadline applicable to MSS applicants.
 
 
 67
 ARINC's claim is specious. ARINC's proposal did not offer to provide a single non-aeronautical service; it is therefore absurd for ARINC now to contend that it merited consideration as a land MSS applicant. Instead, ARINC submitted its application as an AMSS(R) proposal, i.e., a proposal for a dedicated aeronautical services system. The Commission never suggested that ARINC's application was foreclosed by the MSS cut-off; rather, as noted above, the Commission properly reviewed ARINC's application on its merits as a timely AMSS(R) proposal, and concluded, with equal validity, that the application was patently inconsistent with the spectrum allocation rules which had been developed earlier in the rulemaking proceeding.
 
 
 68
 Nor has ARINC suggested that it was prepared to submit a generic MSS application had it known the potential breadth of the MSS system. ARINC admittedly realized the scope of the MSS cut-off when the Commission dismissed its AMSS(R) application. Yet ARINC never thereafter petitioned the Commission for leave to file its own generic MSS application. Nor did ARINC ever seek to join the AMSC consortium, which was formed five months after the dismissal of ARINC's application. Even now, ARINC asks us to reinstate its original application, an application which offered to provide aeronautical services only. ARINC makes no effort to explain, nor can we fathom, how a proposal failing to provide a single land mobile satellite communications service would qualify as an application for land mobile services.
 
 
 69
 ARINC cannot bring a valid claim, therefore, premised on an alleged lack of notice concerning the scope of the land MSS system; ARINC can only challenge the merits of the Commission's rulemaking decisions defining that scope so as to allow the MSS licensee (and not a separate AMSS(R) licensee such as ARINC) to offer APC and to provide all safety-related aeronautical services. Accordingly, we turn to ARINC's substantive challenges to the Commission's decisions to exclude APC from AMSS(R) and to adopt a shared-use allocation of the L-Band.
 
 
 70
 2. The Commission's Spectrum Allocation Rules
 
 
 71
 a. The Exclusion of APC from AMSS(R)
 
 
 72
 The Commission has the clear statutory authority to determine the nature of the services to be provided under particular classes of licenses. See 47 U.S.C. Sec. 303(b) (1988). ARINC contends, however, that the Commission abused this authority when it excluded APC from its definition of AMSS(R). By this exclusion, ARINC argues, the Commission disregarded, without adequate explanation, its established policy of permitting licensees to offer any service technically consistent with their licenses.
 
 
 73
 We find nothing improper in the Commission's exclusion of public correspondence traffic from the AMSS(R) classification. At the very outset of the rulemaking proceedings, the Commission gave clear notice that it considered APC to be outside the scope of AMSS(R) for purposes of its rulemaking proceeding. Thus, the NPR observed that the AMSS(R) frequencies had "been allocated for distress and safety operations as part of a world-wide system,"[38] described AMSS(R) as providing "communications to support domestic and international air traffic, including air traffic control (ATC),"[39] and stated that air traffic control "does not provide passenger communication (air-ground) service."[40]
 
 
 74
 ARINC did not object to the NPR's characterization of AMSS(R) as consisting of safety-related communications. To the contrary, ARINC's comments in response to the NPR reveal that it shared the Commission's view that APC could not be offered under the AMSS(R) classification. See Comments of Aeronautical Radio, Inc., and the Air Transport Association of America at 46 n. 105, Gen. Docket No. 84-1234 (Apr. 22, 1985), reprinted in J.A. 225, 279 ("Public Correspondence is now prohibited in [the AMSS(R) ] ... band. See ITU Radio Reg. 3630."); see also id. at 47, reprinted in J.A. 280 ("ARINC and ATA[ ] have assumed that no public correspondence traffic will be carried in the AMSS").
 
 
 75
 Subsequently, in the Allocation Order the Commission reiterated that AMSS(R) frequencies were "reserve[d] for aeronautical communications of enroute flights related to safety and regularity of flight."[41] "[A]eronautical communications that may not be safety-related," the Commission emphasized, would fall under the category of "non-AMSS(R)."[42]
 
 
 76
 In requesting reconsideration of the Allocation Order, ARINC again did not dispute the Commission's definition of AMSS(R) as providing safety-related services. In fact, such a view would have been patently inconsistent with the basis for ARINC's reconsideration request. ARINC had emphasized that, due to AMSS(R)'s safety-related nature, it should not be required to share spectrum, even on a primary-secondary basis, with a non-safety service. See Petition for Reconsideration and Request for Clarification at 3, Gen. Docket No. 84-1234 (Nov. 24, 1986), reprinted in J.A. 1103, 1110 (contrasting "safety of life and property needs" served by AMSS(R) with "lower priority public correspondence" served by MSS); id. at 6, reprinted in J.A. 1113 (stating that international obligations require the Commission "to defer to safety of life or property in general and AMSS(R) in particular"); id. at 8, reprinted in J.A. 1115 (describing L-Band frequencies as having been "allotted to fulfill the needs of safety-related functions"); id. at 19, reprinted in J.A. 1126 ("any plan for sharing between AMSS(R) and [ ]MSS ... must account for the relative importance of the two services"). Most tellingly, ARINC defined "AMSS(R) communications" by referring to a list of categories of aeronautical mobile services which did not include public correspondence.[43]
 
 
 77
 Only when ARINC submitted its AMSS(R) application, nearly seven months after the issuance of the Allocation Order, was the Commission first apprised that ARINC wished to offer APC under the AMSS(R) classification. Since that time, and contrary to its prior representations, ARINC has contended that the provision of APC under the AMSS(R) classification is now, and was at the outset of the rulemaking proceedings, fully consistent with international regulations concerning frequency allocation and use.[44] Consequently, ARINC claims, the Commission violated established policy and abused its discretion in not allowing an AMSS(R) applicant to provide such service.
 
 
 78
 It is unnecessary for us to decide whether ARINC's most recent interpretation of the relevant international regulations as allowing APC in AMSS(R) is correct. ARINC does not dispute that, even under its current interpretation of the relevant regulations, the decision whether to allow APC in AMSS(R) is a matter for the Commission's discretion. Merely to say that the Commission may have been permitted to include APC in AMSS(R) is a far cry from suggesting that the Commission was required to take such action. By the time ARINC first proposed to offer APC under the AMSS(R) classification, the Commission had a substantial justification, independent of the strictures of international law, for not authorizing such service: the desire to avoid unwarranted delays and added costs to its rulemaking proceedings.
 
 
 79
 The entire Allocation Order had been premised upon the view, then endorsed by ARINC, that AMSS(R), in accordance with international regulations, consisted solely of safety-related communications. AMSS(R) was granted top-priority throughout the entire L-Band precisely because, for purposes of the Commission's rulemaking, AMSS(R) would be limited to safety communications. And because the Commission viewed AMSS(R) as encompassing only routine aeronautical services and not public correspondence, it concluded that allocation of 10 MHz exclusively to AMSS(R) on a primary basis would be adequate to meet AMSS(R) needs.
 
 
 80
 Were the Commission suddenly to have reversed itself in response to ARINC's suggested reinterpretation of international regulations and included APC in AMSS(R), an entirely new allocation proceeding would have been necessary. If AMSS(R) included APC, there would no longer have been a justification for according blanket priority to AMSS(R) throughout the entire L-Band. In addition, the Commission would have had to reallocate primary use of spectrum between MSS and AMSS(R) as a result of the broadening scope of AMSS(R), and the concomitant narrowing scope of MSS.
 
 
 81
 We defer to the Commission's assessment that the delays to the provision of both MSS and AMSS(R) to the public as well as the increased costs resulting from such a revisitation of the Commission's allocation proceeding would have been considerable. We also find no error in the Commission's determination that these burdens would have far outweighed whatever benefits may have accrued from the potential increase in competition among APC providers. Had ARINC wished to offer APC under the AMSS(R) classification, it had ample opportunity to voice this desire before the Commission relied on its earlier definition of AMSS(R) in adopting its comprehensive allocation scheme.
 
 
 82
 In sum, even assuming arguendo that ARINC's newest interpretation of the relevant international regulations is correct, those regulations would merely have permitted the Commission, as a matter of its discretion, to allow APC service in AMSS(R). Given the late stage of the proceedings at which ARINC first argued that APC should be included in AMSS(R), we find no abuse of discretion in the Commission's decision that the public interest would best be served by adhering to its prior exclusion of APC.
 
 
 83
 b. The Shared Allocation Scheme
 
 
 84
 The United States is a member of the International Telecommunication Union ("ITU"), a multi-national public organization formed to facilitate international cooperation in the use and development of telecommunication services. The ITU charter, known as the International Telecommunication Convention, commits member countries to work together to minimize harmful interference between communications systems, and grants the ITU the authority to coordinate system uses among member countries and to effect allocation of spectrum in such a way as to avoid harmful interference.[45] In order to implement international consensus with regard to spectrum use, the ITU periodically sponsors World Administrative Radio Conferences ("WARCs") at which member countries review and revise an international Table of Frequency Allocations. ARINC claims that the FCC's allocation of L-Band spectrum to shared MSS/AMSS(R) use violates the prevailing ITU allocation of those frequencies exclusively for AMSS(R).[46] By authorizing a MSS system in these frequencies, ARINC argues, the Commission has adopted an allocation inconsistent with an international treaty.
 
 
 85
 The Commission concedes that its L-Band allocation for MSS is inconsistent with the international allocation of those frequencies. However, the Commission notes that the ITU permits signatory nations to adopt nonconforming allocations so long as harmful interference is not thereby caused to conforming services. The ITU's regulations provide:
 
 
 86
 Administrations of the Members shall not assign to a station any frequency in derogation of either the Table of Frequency Allocations given in this Chapter or the other provisions of these Regulations, except on the express condition that harmful interference shall not be caused to services carried on by stations operating in accordance with the provisions of the Convention and of these Regulations.
 
 
 87
 Radio Regulations, art. 6, Sec. 4 (emphasis added). The Commission maintains that its allocation is fully consistent with this provision. The Commission has stated its intention to engage in international coordination efforts which it claims will enable the MSS licensee to use its allotted frequencies without interfering with the systems of other countries.
 
 
 88
 The international coordination process is described in Article 11 of the ITU Radio Regulations. An administration seeking to use particular frequencies provides information concerning its planned satellite system to the International Frequency Registration Board ("IFRB"), which publishes this information and notifies all member countries of the proposal.[47] The administration proposing the new system then must try to effect coordination with all administrations whose systems might be affected by the frequency assignments expected to be used by the new system.[48] Coordination involves an exchange of data between administrations concerning frequency assignments, and their attempts to negotiate an agreement enabling both systems to operate normally.[49]
 
 
 89
 The frequency assignment is then submitted to the IFRB for review. The ITU Radio Regulations provide that, even where a proposed use is not in conformity with the Table of Allocations, the IFRB will allow the assignment and enter it in the Master Register so long as coordination efforts have proven successful and the administration specifically pledges not to cause interference with conforming uses.[50]
 
 
 90
 Given the Commission's assurance that the AMSC system will not in fact cause harmful interference to the L-Band systems of other countries, and given its willingness to engage in international coordination, the Commission's shared-allocation seems facially consistent with international regulations. Of course, because AMSC's system is still at the pre-operational stage, we cannot determine whether the Commission's sanguine view of the prospects of international coordination will prove correct. This is not due, however, to any impropriety on the part of the Commission; rather, it is a simple reality that no final judgment is possible absent completion of the coordination process, i.e., after interaction between actual licensees with concrete system proposals.
 
 
 91
 In any event, our decision in this matter is controlled by the limited standard of review applicable to the question at hand. Our sole task is to determine whether the Commission's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1988). This deferential standard admits of no reversible error with respect to the issue in dispute. The Commission has openly recognized that the ITU Regulations prohibit its L-Band allocation from causing harmful interference with the conforming systems of other countries, and has asserted that it will not allow its MSS system to cause such interference. ARINC has presented no reason for us to doubt the Commission's assurance that it will act in conformity with its acknowledged international obligations. See Douglas v. Hampton, 512 F.2d 976, 989 & n. 102 (D.C.Cir.1975) (court must assume that Civil Service Commission will act in accordance with applicable law, absent evidence to the contrary). Accordingly, we find that the Commission's domestic allocation is permissible.
 
 
 92
 The only remaining question with regard to the Commission's allocation scheme, then, is whether, given the non-interference restriction upon the United States' use of the L-Band, it will prove feasible for AMSC to operate its MSS/AMSS(R) system. This predictive judgment, however, which merely touches upon the reasonableness of the Commission's allocation and not the Commission's international treaty obligations, is of the type which we have historically left to agency discretion. See International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 821 (D.C.Cir.1983) (an agency's "predictive judgments about areas that are within the agency's field of discretion and expertise" entitled to "particularly deferential" review).
 
 
 93
 As the agency directly responsible for numerous international coordination efforts on behalf of civilian communications systems, the Commission has first-hand experience to support its judgment concerning the feasibility of its allocation scheme. We therefore defer to the Commission's belief that its allocation scheme will prove compatible with its international obligations. We do so with the caveat, however, that, should the Commission's predictions about the effectiveness of international coordination prove erroneous, the Commission will need to reconsider its allocation in accordance with its continuing obligation to practice reasoned decisionmaking.
 
 
 94
 In conclusion, we reject each of ARINC's challenges to the Commission's decisions and uphold the dismissal of ARINC's application.
 
 
 95
 B. The MSS Petitioners' Challenges to the Rulemaking Proceeding
 
 
 96
 As noted above, the Commission dismissed the applications of Global, Globesat and MSSI (i.e., "the MSS petitioners"), because these applicants failed to make $5 million cash contributions to the consortium in accordance with the Commission's financial eligibility rules. These petitioners now challenge the validity of the $5 million cash contribution requirement; the MSS petitioners also challenge the propriety of the Commission's decision to award the MSS license to a consortium of interested applicants in lieu of holding comparative hearings. Alternatively, the MSS petitioners contend that the NPR failed to provide adequate notice of either rule. We first address their challenges to the $5 million cash contribution requirement.
 
 
 97
 1. The $5 Million Dollar Cash Contribution Rule
 
 
 98
 a. Notice of the Rule
 
 
 99
 The MSS petitioners argue that the Commission failed to provide sufficient notice that it might require applicants to contribute funds to the consortium to demonstrate their financial eligibility.
 
 
 100
 Section 553 of the Administrative Procedure Act ("APA"), 5 U.S.C. Sec. 551 et seq. (1988), requires an agency to provide published notice of its proposed rulemaking. Such notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. Sec. 553(b)(3) (1988). In applying this provision, we have held that the notice requirement is satisfied so long as the content of the agency's final rule is a "logical outgrowth" of its rulemaking proposal. See United Steelworkers of America v. Marshall, 647 F.2d 1189, 1221 (D.C.Cir.1980), cert. denied, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). The focus of the "logical outgrowth" test, we have added, "is whether ... [the party], ex ante, should have anticipated that such a requirement might be imposed." Small Refiner Lead Phase-Down Task Force v. United States Environmental Protection Agency, 705 F.2d 506, 549 (D.C.Cir.1983).
 
 
 101
 We find that the logical outgrowth test was met in this case. In the NPR, the Commission apprised interested applicants that they would be required to demonstrate their financial ability to meet the costs of constructing, launching and operating a satellite system for one year.[51] Applications failing to make such a showing, the Commission admonished, would be deemed defective.[52] The Commission also directed applicants to indicate an ownership or participation proposal "keyed to the Commission's desire ... to authorize a single entity while promoting participation and cooperation."[53]
 
 
 102
 Thus, the NPR apprised MSS applicants that they would need to demonstrate the financial wherewithal to finance a MSS system, probably through some type of joint ownership entity. In the NPR the Commission also described, as a "useful study model," a prior licensing procedure involving a joint venture maritime satellite communications system known as MARISAT.[54] In Comsat Corp., 40 F.C.C.2d 496 (1973), the Commission noted, it had required participants to contribute at least $1 million as an entrance fee for membership in the MARISAT consortium. See id. at 507.
 
 
 103
 Given the Commission's expressed interest in a multi-ownership approach, as well as its reference to its earlier handling of the MARISAT consortium, we find that the MSS petitioners reasonably should have anticipated that the Commission might license a multi-ownership entity and require applicants to contribute funds to such an entity as a criterion of membership. Accordingly, the Commission's $5 million cash contribution rule was a "logical outgrowth" of the rules concerning financial requirements contained in the NPR, and the petitioners were not deprived of reasonable notice of the Commission's action.
 
 
 104
 b. The Validity of the Rule
 
 
 105
 We find, however, that the Commission's requirement that applicants contribute $5 million in cash to the consortium was not the product of reasoned decision-making. As noted previously, the Bureau relaxed the Commission's original cash-only rule and agreed to accept performance bonds or letters of credit when several applicants suggested that these instruments were equally good indicia of financial ability. In subsequently reversing this decision and reinstituting the cash-only requirement, the Bureau never adequately explained why a cash deposit was necessary to demonstrate financial qualification. The Bureau's failure to justify its insistence upon a cash deposit renders that requirement arbitrary and capricious.
 
 
 106
 The reimposition of the cash-only rule was prompted by allegations from some applicants concerning the financial qualifications of others. Normally, the Commission is obligated to determine material questions of fact concerning license applications through hearings. See 47 U.S.C. Sec. 309(e) (1988). Here, however, the Bureau rejected that option with regard to the financial qualifications of the MSS applicants, claiming that hearings "would be costly and time consuming."[55] Instead, the Bureau stated that "[a]ny questions raised with regard to financial qualifications can be expeditiously resolved by implementing" the requirement that contributions to the consortium be made in cash.[56]
 
 
 107
 We need not decide when, if ever, the Commission may determine the financial eligibility of license applicants through the imposition of a blanket contribution requirement rather than through a comparative hearing process.[57] Even assuming arguendo that a contribution requirement might be appropriate under certain circumstances, the Commission's decision to reinstate its cash-only requirement in this case was clearly arbitrary and capricious.
 
 
 108
 Any financial eligibility requirement imposed upon license applicants must bear some reasonable relationship to true financial fitness. That the Commission's cash rule did not purport to be based on any such relationship is apparent from the Commission's decision on reconsideration of the Bureau's dismissal of the MSS petitioners' applications. The Commission there provided the following explanation for its reimposition of the cash rule:
 
 
 109
 The various challenges and allegations ... concerning the applicants' financial qualifications appeared to be impeding an agreement among the applicants and this is substantiated by the applicants' failure to agree to an organizational structure by the established deadline. Thus, the Bureau's August 13th Order appropriately recognized that in order for a settlement to be effectuated, any concerns regarding an applicant's financial qualifications had to be resolved before negotiations among the applicants could proceed. The August 13th Order sought to bring these particular issues to a speedy and certain resolution by ordering each applicant to demonstrate its financial qualifications through a cash contribution into a joint escrow account.
 
 
 110
 4 F.C.C.Rcd at 6034-35 (footnotes omitted).
 
 
 111
 The Commission nowhere determined whether the "challenges and allegations" concerning some applicants' financial qualifications had any justifiable basis. Nor did the Commission determine that the letters of credit and performance bonds previously submitted by Global, Globesat and MSSI were inadequate to demonstrate their financial eligibility. Accordingly, the reimposition of a cash-only requirement bore no apparent relation to true financial fitness. Instead, the cash rule appears to have been nothing more than an arbitrary device by which the Commission was able to winnow the applicant field, thus increasing the probability that a joint agreement could be reached among the survivors.
 
 
 112
 Global and Globesat suggest that a practical effect of the cash rule was to discourage continued participation by those applicants whose views of the proper form of the consortium diverged from those of the majority of the applicants. Since the Commission required applicants to contribute $5 million in cash before any operating agreement for the consortium had been reached, applicants faced the risk of investing large sums of money in a consortium which they ultimately might not wish to join. Although the Commission would have allowed applicants who eventually withdrew from the consortium to reclaim their $5 million deposit, such applicants would still have incurred a potentially sizable expense in forgone interest as a result of having their funds tied up in a low-interest account while negotiations concerning a joint operating agreement were pending.
 
 
 113
 Accordingly, Global and Globesat argue, rather than weeding out applicants of dubious financial qualifications, the Commission's cash-only requirement had the effect of eliminating those applicants whose views concerning the proper form of the consortium were in the minority, and who therefore feared that a cash investment in the consortium would prove a waste of resources.[58] Continued participation in the application process, meanwhile, was feasible only for those applicants who were confident that the consortium ultimately adopted would resemble that which they desired.
 
 
 114
 Since the Commission never suggested any legitimate financial justification for its requiring cash instead of letters of credit or performance bonds, we cannot say whether the MSS petitioners failed to meet the cash-only rule because they were truly unfit financially or because, as Global and Globesat claim, they simply thought the costs of further participation too high, given the low probability that their views ultimately would be accepted by the applicant group. Thus, while the Commission's cash-only requirement had the desired effect of facilitating the expeditious formation of a joint agreement, it may have done so only by snuffing out all minority voices and leaving a consortium pool of like-minded applicants. The Commission cannot eradicate nonconformity under the pretext of assessing financial qualifications. Accordingly, we find that the Commission's reimposition of the $5 million cash-only rule was arbitrary and capricious, and that the Commission's dismissal of the MSS petitioners' applications was improper.[59]
 
 
 115
 2. The Legality of a Mandatory Consortium in Lieu of Comparative Hearings
 
 
 116
 Having determined that the specific basis for the dismissal of the MSS petitioners' applications was improper, we now turn to the more general challenge of these petitioners, i.e., their challenge to the consortium requirement itself.
 
 
 117
 a. The Standing of the MSS Petitioners
 
 
 118
 The Commission initially challenges the MSS petitioners' constitutional standing to challenge the consortium rule. The Commission notes that none of these applicants were dismissed for refusing to join the consortium; rather, they were rejected for failing to contribute $5 million in cash to the consortium in accordance with the Commission's so-called financial eligibility requirement. Thus, while the MSS petitioners may properly challenge the $5 million rule, the Commission submits, they lack standing to challenge the consortium rule itself, since the dismissal of their applications is not fairly traceable to that requirement. See generally Allen v. Wright, 468 U.S. 737, 750-52, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984).
 
 
 119
 We reject this contention. The $5 million rule was merely an adjunct to the consortium rule; it was the means by which the Commission implemented the consortium, and the Commission has not suggested that it would have imposed a similar cash contribution requirement had it not adopted a consortium approach. Since the $5 million rule was premised on the existence of the consortium, the most obvious injury suffered by the MSS petitioners, the dismissal of their applications, is directly related to the consortium rule. Accordingly, the consortium rule bore a "fairly traceable causal connection" to the dismissal of the MSS petitioners' applications sufficient to support standing. See Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) (quotation marks omitted).
 
 
 120
 Furthermore, there can be no doubt that the Commission's consortium rule directly injured petitioner Global, apart from the dismissal of its application, in that it precluded Global from prosecuting an individual application. In the order establishing the consortium, the Commission frankly stated that it had "rejected other licensing alternatives," including comparative hearings, and offered no suggestion that it would grant consideration to applicants who refused to join the consortium.[60] The Commission therefore indicated that the only way for applicants to participate in the MSS system was to become consortium members.
 
 
 121
 Global unsuccessfully sought reconsideration of the Commission's consortium rule, arguing that comparative hearings were required and that the public would suffer if the consortium adopted a service proposal other than its own.[61] Global submitted its letter of credit to the consortium only under protest, reserving its rights to challenge the consortium requirement itself.[62] When its application was dismissed, Global again argued to no avail that it was improper for the Commission to dismiss the applications of those who refused to join the consortium without a comparative hearing.[63] Global still maintains that its individual proposal is superior to any which could be reached by a consortium of the other MSS applicants. Accordingly, the consortium rule has caused a distinct and cognizable injury to Global, namely, the preclusion of consideration of its individual application.[64]
 
 
 122
 b. Notice of the Consortium Rule
 
 
 123
 The MSS petitioners argue that the Commission failed to provide adequate notice in the NPR of the consortium rule. They concede that the Commission asked for comments on a consortium approach to licensing in the NPR, but assert that the Commission's request could reasonably be understood only to suggest that the licensee chosen after a comparative hearing process might be required to offer ownership shares in its satellite corporation to all interested parties, not that the Commission would forgo comparative hearings altogether and require all interested applicants to form their own consortium. We disagree.
 
 
 124
 In the NPR, the Commission stated that "a multi-ownership arrangement seems a reasonable approach" to licensing MSS.[65] The Commission then cited proposals for consortium ownership by applicants Skylink America ("Skylink") and Mobilesat, which the MSS petitioners concede "would indeed have resembled the final rule if they had been adopted."[66] Although the MSS petitioners argue that the Commission's explicit rejection of these proposals in the NPR deprived them of any value as notice of the eventual consortium rule, the Commission merely refused to accept either proposal without first reviewing alternative proposals and comments submitted in response to the NPR. See 50 Fed.Reg. at 8160 ("Due to the great disparity between the two proposals, ... we find that selection now of a single candidate's proposal as a reference application would be unwarranted and premature.") (emphasis added). The Commission's refusal to adopt either Skylink's or Mobilesat's specific proposal without further reflection hardly constituted a rejection of the consortium approach.
 
 
 125
 In addition, the Commission expressly noted that a consortium might obviate the need for a comparative hearing,[67] and asked for comments on whether a consortium structure should be "mandatory."[68] The Commission also cited other licensing procedures where it had approved joint ownership arrangements which apparently permitted it to avoid comparative hearings,[69] and stated its hope that "some type of agreement among interested applicants will obviate the need for a comparative process."[70] Finally, the filed comments of other MSS applicants indicate that they understood the Commission to be considering a requirement that all applicants join a consortium.[71] Consequently, we find that the Commission's ultimate consortium rule was clearly a "logical outgrowth" of the ownership rules proposed in the NPR.
 
 
 126
 c. The Legality of the Consortium Rule
 
 
 127
 The MSS petitioners argue that the Commission's decision to forgo comparative hearings and require all interested applicants to form a consortium violates Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). As previously noted, that case recognized the Commission's statutory duty to hold comparative hearings when presented with bona fide and mutually exclusive license applications. The MSS petitioners state that the Commission's mandate that all applicants form a consortium effectively denied without such a hearing the mutually exclusive applications of those applicants who would have preferred implementation of their individual proposals. This, they contend, was an abdication of the Commission's duty to select, after full evidentiary hearing, the application which would best serve the public interest. We agree that the Commission has not provided an adequate justification for its abandonment of the hearing approach in this case.
 
 
 128
 The comparative hearing process is unquestionably the standard method for the Commission to resolve mutually exclusive applications. As we have recognized, "[t]he basic teaching" of Ashbacker is that "comparative consideration ... is the process most likely to serve the public." Community Broadcasting Co. v. FCC, 274 F.2d 753, 759 (D.C.Cir.1960). In other contexts, we have rigorously protected the right to a comparative hearing established by Ashbacker. Thus, in Kessler v. FCC, 326 F.2d 673 (D.C.Cir.1963), we found that the Commission could not lawfully apply a "freeze" on radio station license applications so as to preclude acceptance of applications which were mutually exclusive with others already on file. The effect of such a procedure, we noted, would be to "freeze new applicants permanently out of a right of substance--the comparative hearing on the pending application to which they are entitled." Id. at 688. And in Citizens Communications Center v. FCC, 447 F.2d 1201 (D.C.Cir.1971), we invalidated a Commission policy denying challengers to incumbent licensees a full comparative hearing unless the Commission first determined that the incumbent had provided inadequate service. This policy, we held, constituted a clear violation of the Commission's obligation to hold a full comparative hearing whenever presented with mutually exclusive applications. Id. at 1211-13.
 
 
 129
 The Commission itself has acknowledged that it "cannot, of course, direct mutually exclusive applicants to enter into agreements to avoid the comparative evaluation to which they are entitled under Section 309(e) ... and Ashbacker." Advanced Mobile Phone Service, Inc., 93 F.C.C.2d 683, 691 (1983).[72] Nonetheless, the Commission argues that it may forgo comparative hearings and adopt a consortium approach in the exercise of its rulemaking authority. In support of this argument, the Commission relies exclusively on Telocator Network of America v. FCC, 691 F.2d 525 (D.C.Cir.1982).[73]
 
 
 130
 Telocator involved the Commission's licensing procedure for 24 new radio channels.. The Commission had decided to allocate two 12-channel blocks for shared use by all interested common carriers rather than to solicit mutually exclusive applications for those channels. Id. at 529-30. This approach obviated the need for comparative hearings on individual applications, the Commission felt, since every eligible licensee would be awarded a license. The Commission then asked applicants in each market to indicate which technical coordination method would be most appropriate for implementing its shared-use system, and the method that received the plurality of votes from applicants became the Commission's proposed rule for that market. The Commission deemed this plurality approach preferable to conducting comparative hearings on technical coordination methods, since it would greatly expedite the provision of service to the public through the new channels. A trade association of radio common carriers challenged the Commission's selection of a coordination method by rulemaking, arguing that such action violated Ashbacker's comparative hearing requirement. Upon review, we found that the Commission's "alternative procedure" for choosing a coordination method was "both authorized and appropriate," id. at 551, since the issues relevant to selecting a technical method were "thoroughly appropriate for resolution by rulemaking," id. at 552.
 
 
 131
 The Commission claims that its consortium rule in this case is analytically indistinguishable from the coordination rule upheld in Telocator. We do not share this view, for we perceive a fundamental distinction between the two cases: in Telocator, the Commission established rules for all licensees; here, the Commission established the licensee itself by rule. There is no suggestion in Telocator that the no-hearing, open access policy violated Ashbacker; this is so because, in Telocator, there were no mutually exclusive applications for licenses. In Telocator, the Commission was prepared to approve any individual license application, as long as the applicant conformed with the technical coordination plan ultimately chosen. The Commission characterized differences in technical coordination methods as "relatively unimportant," id. at 536 (quoting Memorandum Opinion and Order for Docket No. 21039, 77 F.C.C.2d 201, 215 (1980)), and represented that no applicants would be precluded from obtaining a license as a result of its choice of coordination methods.
 
 
 132
 In upholding the Commission's rulemaking procedure in Telocator, the court acknowledged that all applicants would be "given a chance to conform their proposals to" the coordination plan ultimately selected. Id. at 552. Thus, like the spectrum allocation rules underlying the Commission's dismissal of ARINC's application, the coordination plan in Telocator essentially served as a legitimate eligibility requirement for prospective applicants. As we have already noted in our discussion of ARINC's claims, such requirements, if consistent with the Communications Act, may properly be established through rulemaking. See Storer, 351 U.S. at 202-05, 76 S.Ct. at 770-71.
 
 
 133
 In stark contrast, the Commission's adoption of the consortium requirement in this case precluded applicants from prosecuting their individual applications at all. The Commission decreed that the MSS licensee would be a consortium of all applicants, formed through mutual agreement. Because of the Commission's rule, no individual applicant was granted the opportunity to demonstrate that its individual application, or a consortium based upon its application, would be superior to a consortium formed by agreement of the applicants.
 
 
 134
 We find disingenuous the Commission's claim that there was no mutual exclusivity in this case because all applicants were allowed to offer their proposed services through the consortium. It is beyond dispute that the Commission's adoption of a consortium approach served to foreclose all individual license applications. Once the Commission announced its consortium rule, applicants had little choice; either they agreed to join the consortium or they lost the opportunity to participate in the MSS system at all. To the extent the consortium's MSS system differed from that which some applicants had envisioned, the individual proposals of those applicants were effectively denied.
 
 
 135
 As noted, Global had argued that its application was demonstrably superior to those of the other applicants, and that the public interest could best be served only through a voluntary consortium based on Global's specific proposal. By considering these claims as challenging its broad rulemaking discretion rather than as raising issues appropriately resolved by comparative hearing, the Commission effectively rejected Global's proposal without ever addressing Global's claim that its application was superior to all other alternatives. We do not believe such a result is consistent with the Commission's obligation to further the public interest.
 
 
 136
 The Commission's rulemaking authority is not unbounded. Even giving the Commission the full benefit of the doubt, it would appear that the agency is acting only at the periphery of its authority in adopting a rule which eliminates mutual exclusivity through the simple expedient of prohibiting license applicants from pursuing their individual applications and requiring them to form a joint agreement. We need not determine here whether the Commission would ever be justified in imposing a consortium requirement in a licensing proceeding. At a minimum, we believe any such departure from the statutorily prescribed and judicially recognized practice of resolving mutually exclusive applications through comparative hearings must be premised on some truly compelling grounds that are special to the particular proceeding in which the Commission proposes to adopt a consortium procedure--otherwise, the Commission could impose a consortium requirement in every license proceeding involving multiple applicants, rendering the comparative hearing requirement a nullity.
 
 
 137
 In this case, none of the purported bases for the Commission's selection of a consortium approach in lieu of comparative hearings suggests the special circumstances we believe would be necessary to justify abandonment of the comparative hearing procedure. The Commission noted that a consortium approach would maximize the number of MSS providers; enable small companies to participate; allow optimal responsiveness to market demand for MSS; and expedite funding by spreading costs and risks.[74] These factors, however, apply with equal force to any licensing proceeding. Were we to approve the imposition of a consortium approach in this case based upon the Commission's stated rationale, the Commission could evade the comparative hearing requirement at whim, in direct violation of the statute's and the case law's strong presumption in favor of such hearings. Moreover, most of these objectives can be achieved by granting a license to the best applicant and then encouraging or requiring it to allow others to participate on terms that would neither diminish the advantages of the winning applicant nor risk causing undue conflict among participants.
 
 
 138
 The Commission also reasoned that comparative hearings would be costly and time-consuming, and that comparative evaluation of MSS applications would be extremely difficult.[75] While we concede that delay, expense and arduous choices are among the burdens associated with comparative hearings, they are burdens that Congress found to be outweighed by the benefits of a reasoned assessment of the public interest by the agency entrusted with furthering that interest. Accordingly, these burdens do not justify the Commission's avoidance of a comparative procedure.
 
 
 139
 Finally, the Commission expressed concern that, given the rapid evolution of satellite technology, the selection of a single licensee on the basis of an initial submitted application might award the MSS license to a system that could become obsolete by the time it was launched. We recognize that the swift pace of satellite technology, unlike the other factors mentioned by the Commission, separates the present case to some extent from the typical Commission licensing proceeding. However, this factor does not nullify the statutory requirement of comparative hearings with respect to mutually exclusive applications. The Commission can certainly allow individual applicants to retain flexibility for technological developments in their proposals. And the adaptability of a given proposal to technological progress will be a legitimate factor for the Commission to consider in selecting the winning applicant. Indeed, it seems reasonable to suppose that, in most cases, the applicant found to be best qualified on other measures will also be the most apt at incorporating technological change.
 
 
 140
 We therefore set aside the Commission's consortium requirement and direct the Commission to reconsider its ownership rules. We need not decide at this juncture whether the Commission has the statutory authority to impose a consortium requirement in lieu of holding comparative hearings with respect to mutually exclusive license applications. This would appear to be a dubious suggestion, and Telocator is not dispositive of the question. Nonetheless, we will leave it to the Commission in the first instance to address the issue.
 
 
 141
 On remand, the Commission must first consider whether it possesses the requisite statutory authority to impose a consortium in lieu of holding comparative hearings. Then, assuming that the Commission can point to some legitimate basis for the exercise of such authority, the Commission may consider the adoption of a forced consortium approach if it can demonstrate that a departure from the comparative hearing process is justified by truly compelling factors that are special to the present licensing proceeding.
 
 
 142
 We regret that our present decision has the effect of delaying the provision of a valuable and innovative communications service to the public. However, when the Commission chooses to deviate from the statutorily prescribed comparative hearing procedure in its processing of mutually exclusive license applications, it must provide a compelling reason for doing so. Since the Commission has offered none in this case, we have no choice but to find its adoption of the consortium rule to be arbitrary and capricious.[76]
 
 III. CONCLUSION
 
 143
 The dismissal of ARINC's application is upheld. The Commission's $5 million cash contribution and consortium rules are vacated, and the dismissals of Global's, Globesat's and MSSI's applications are reversed. The case is remanded to the Commission for reconsideration of the $5 million and consortium rules and for further proceedings consistent with this opinion.
 
 
 144
 So Ordered.
 
 
 
 [1]
 NASA, Petition for Rulemaking, Mobile Satellite Service (Nov. 29, 1982), reprinted in Joint Appendix ("J.A.") 171
 
 
 [2]
 NASA asserted in its rulemaking petition that a MSS system would make mobile telephone communications available for the first time to individuals living in many remote, rugged or sparsely populated areas of the United States, would enhance disaster and emergency communications capabilities in such areas and would greatly benefit industries, such as the trucking and petroleum industries, whose service areas and work sites frequently lie outside the scope of existing terrestrial mobile systems
 
 
 [3]
 Rules to Allocate Spectrum for, To Establish Rules and Policies Pertaining to, the Use of Radio Frequencies in Land Mobile Satellite Service for Various Common Carrier Services, 50 Fed.Reg. 8149 (1985) ("NPR")
 
 
 [4]
 The L-Band consists of the frequencies between 1525-1670 MHz. See id. at 8154 n. 41
 
 
 [5]
 Id. at 8154. The Commission clarified this definition by adding that ATC "does not provide passenger communication (airground) service." Id. at 8155
 
 
 [6]
 Id
 
 
 [7]
 Id. at 8160
 
 
 [8]
 Letter from John L. Bartlett to Dr. Robert Powers, Chief Scientist, Federal Communications Commission (Mar. 20, 1985), reprinted in J.A. 221
 
 
 [9]
 Letter from Dr. Robert S. Powers to John L. Bartlett (Mar. 25, 1985), reprinted in J.A. 223
 
 
 [10]
 Amendment of Parts 2, 22 and 25 of the Commission's Rules to Allocate Spectrum for, and to Establish Other Rules and Policies Pertaining to the Use of Radio Frequencies in a Land Mobile Satellite Service for the Provision of Various Common Carrier Services, 2 F.C.C.Rcd 1825 (Sept. 19, 1986) ("Allocation Order")
 
 
 [11]
 The Commission left unchanged a prior allocation of one MHz of spectrum to AMSS(R) and radio astronomy service
 
 
 [12]
 Services possessing a "primary" allocation are protected from interference from services using a "secondary" allocation, while "secondary" services must tolerate interference from "primary" services. See Radio Regulations, Dec. 6, 1979, annex, art. 8, Sec. 8(4), S. Treaty Doc. No. 21, 97th Cong., 1st Sess. (1981), ratified, 97th Cong., 2d Sess., 128 CONG.REC. 33,138 (1982) ("Radio Regulations")
 
 
 [13]
 2 F.C.C.Rcd at 1845
 
 
 [14]
 Aeronautical Radio, Inc., 2 F.C.C.Rcd 5990, 5991 (Sept. 10, 1987) ("ARINC Dismissal Order "). The Commission also found that ARINC had not demonstrated its financial qualification to operate an AMSS(R) system. However, the Commission subsequently reversed this aspect of its decision upon reconsideration. See Aeronautical Radio, Inc., 4 F.C.C.Rcd 6067, 6069 (Aug. 4, 1989) ("ARINC Reconsideration Order ")
 
 
 [15]
 APC is an air-to-ground public service which enables airplane passengers to place telephone calls while en route
 
 
 [16]
 See ARINC Reconsideration Order, 4 F.C.C.Rcd 6067; Amendment of Parts 2, 22 and 25 of the Commission's Rules to Allocate Spectrum for, and to Establish Other Rules and Policies Pertaining to the Use of Radio Frequencies in a Land Mobile Satellite Service for the Provision of Various Common Carrier Services, 2 F.C.C.Rcd 6830 (Nov. 9, 1987) ("Allocation Reconsideration Order "); Amendment of Parts 2, 22 and 25 of the Commission's Rules to Allocate Spectrum for, and to Establish Other Rules and Policies Pertaining to the Use of Radio Frequencies in a Mobile Satellite Service for the Provision of Various Common Carrier Services, 4 F.C.C.Rcd 6016 (Aug. 4, 1989) ("Allocation Further Reconsideration Order ")
 
 
 [17]
 50 Fed.Reg. at 8155-56
 
 
 [18]
 Id. at 8157
 
 
 [19]
 Id. at 8168
 
 
 [20]
 See Amendment of Parts 2, 22 and 25 of the Commission's Rules to Allocate Spectrum for, and to Establish Other Rules and Policies Pertaining to the Use of Radio Frequencies in a Land Mobile Satellite Service for the Provision of Various Common Carrier Services, 2 F.C.C.Rcd 485, 486 (Jan. 26, 1987) ("Ownership Rules Order ")
 
 
 [21]
 Id. at 487
 
 
 [22]
 See id. at 488
 
 
 [23]
 Id. at 492
 
 
 [24]
 See Amendment of Parts 2, 22 and 25 of the Commission's Rules to Allocate Spectrum for, and to Establish Other Rules and Policies Pertaining to the Use of Radio Frequencies in a Land Mobile Satellite Service for the Provision of Common Carrier Services, 2 F.C.C.Rcd 2417, 2417 (Apr. 6, 1987)
 
 
 [25]
 A tenth applicant, Mobile Satellite Corporation ("Mobilesat"), refused to join either group
 
 
 [26]
 See Amendment of Parts 2, 22 and 25 of the Commission's Rules to Allocate Spectrum for, and to Establish Other Rules and Policies Pertaining to the Use of Radio Frequencies in a Land Mobile Satellite Service for the Provision of Various Common Carrier Services, 2 F.C.C.Rcd 5647, 5648 (Aug. 13, 1987)
 
 
 [27]
 See id
 
 
 [28]
 Global Land Mobile Satellite, Inc., 2 F.C.C.Rcd 5552 (Sept. 4, 1987)
 
 
 [29]
 Amendment of Parts 2, 22 and 25 of the Commission's Rules to Allocate Spectrum for and to Establish Other Rules and Policies Pertaining to the Use of Radio Frequencies in a Land Mobile Satellite Service for the Provision of Various Common Carrier Services, 4 F.C.C.Rcd 6041 (Aug. 4, 1989) ("Licensing Order ")
 
 
 [30]
 Amendment of Parts 2, 22 and 25 of the Commission's Rules to Allocate Spectrum for and to Establish Other Rules and Policies Pertaining to the Use of Radio Frequencies in a Land Mobile Satellite Service for the Provision of Various Common Carrier Services, 4 F.C.C.Rcd 6029 (Aug. 4, 1989) ("MSS Petitioners Reconsideration Order ")
 
 
 [31]
 The order dismissing ARINC's application was released on September 10, 1987. See ARINC Dismissal Order, 2 F.C.C.Rcd 5990. AMSC was not awarded the MSS license until August 4, 1989. See Licensing Order, 4 F.C.C.Rcd 6041
 
 
 [32]
 ARINC Dismissal Order, 2 F.C.C.Rcd at 5991
 
 
 [33]
 Allocation Order, 2 F.C.C.Rcd at 1845 (emphasis added)
 
 
 [34]
 Id
 
 
 [35]
 The AMSC proposal, which was accepted by the Commission, offered to provide both MSS and AMSS(R) as part of one system and to guarantee safety-related aeronautical communications priority access to all frequencies. Thus, AMSC's application, unlike ARINC's, was fully consistent with the Commission's expressed goal of providing for both AMSS(R) and MSS in the L-Band
 For this reason, there is no merit to ARINC's contention that the Commission's rejection of ARINC's application and approval of AMSC's stemmed from improper discrimination against ARINC in favor of the MSS applicant. The different fates accorded these two applications can fully and legitimately be attributed to the degree to which they each did or did not conform to the Commission's application rules.
 
 
 [36]
 Allocation Order, 2 F.C.C.Rcd at 1865 n. 115 (emphasis added)
 
 
 [37]
 Id. at 1865 n. 117
 
 
 [38]
 50 Fed.Reg. at 8154 n. 46 (emphasis added)
 
 
 [39]
 Id. at 8154 (emphasis added)
 
 
 [40]
 Id. at 8155
 
 
 [41]
 Allocation Order, 2 F.C.C.Rcd at 1865 n. 115 (emphasis added)
 
 
 [42]
 Id. at 1865 n. 117
 
 
 [43]
 See id. at 20, reprinted in J.A. 1127 (citing International Civil Aviation Organization Convention, annex 10, vol. II, Sec. 5.1.8 (1985), reprinted in Brief for Petitioners Aeronautical Radio, Inc., and Air Transport Association of America, addendum at 8 (dividing aeronautical mobile communications into the following categories: i) distress messages; ii) urgency messages; iii) directional communications; iv) flight safety messages; v) meteorological messages; and vi) flight regularity messages))
 ARINC did submit, along with its petition for reconsideration, a study of overall aeronautical communications needs which included information relating to APC. However, that proposal merely suggested that public correspondence could be carried as part of an integrated aeronautical services system, not that APC could be offered under the AMSS(R) classification. See Petition for Reconsideration and Request for Clarification, Appendix A, reprinted in J.A. 1138.
 
 
 [44]
 The relevant regulations are various provisions of the International Telecommunication Union ("ITU") Radio Regulations regarding aeronautical mobile and aeronautical mobile satellite systems
 
 
 [45]
 International Telecommunication Convention, Nov. 6, 1982, preamble and art. 4, S. Treaty Doc. No. 6, 99th Cong., 1st Sess. (1985), ratified, 131 CONG. REC. 17,674 (1985)
 
 
 [46]
 The most recent international allocation of radio spectrum was made at the 1987 WARC for the Mobile Services. Under this allocation, the L-Band was divided into separate blocks for land, aeronautical and maritime mobile satellite services. Believing that this block allocation approach unduly restricted allocations for mobile satellite services, the United States took a reservation to the 1987 WARC allocation of the L-Band and stated its "intention to utilize these bands in the way most appropriate to satisfy its particular mobile satellite services requirements recognizing the priority of AMSS(R) and maritime safety communications." ITU, Final Acts of the World Administrative Radio Conference for the Mobile Services (MOB-87), Oct. 17, 1987, Final Protocol No. 58. ARINC and the Commission agree that this reservation has the effect of maintaining, as to the United States, the pre-1987 allocation of these frequencies exclusively for AMSS(R)
 
 
 [47]
 Radio Regulations, art. 11, Sec. 1
 
 
 [48]
 Id. Sec. 6
 
 
 [49]
 Id. Secs. 7-15
 
 
 [50]
 Id., art. 13, Sec. 13(2)
 
 
 [51]
 50 Fed.Reg. at 8168, Attachment E
 
 
 [52]
 Id. at 8160 n. 81
 
 
 [53]
 Id. at 8168, Attachment E
 
 
 [54]
 Id. at 8156
 
 
 [55]
 2 F.C.C.Rcd at 5648
 
 
 [56]
 Id
 
 
 [57]
 While we have observed that the Commission's imposition of a $1 million contribution requirement in Comsat Corp., 40 F.C.C.2d 496, notified MSS applicants that the Commission might impose a similar requirement here, Comsat Corp. does not, of course, establish the validity of such a requirement, given that the Commission's decision in that case was never made subject to judicial challenge
 
 
 [58]
 It is undisputed that this winnowing effect was far less likely under the less restrictive version of the Commission's contribution rule, since performance bonds and letters of credit may be obtained at comparatively low cost
 
 
 [59]
 Since we find that the cash-only requirement was arbitrary and capricious, we need not address MSSI's separate challenges to the Commission's financial eligibility rules
 
 
 [60]
 Ownership Rules Order, 2 F.C.C.Rcd at 487
 
 
 [61]
 Global Land Mobile Satellite, Inc., Petition for Reconsideration, Gen. Docket No. 84-1234 (Mar. 12, 1987), reprinted in J.A. 1166, 1171-74
 
 
 [62]
 Global Land Mobile Satellite, Inc., Notification (Apr. 13, 1987), reprinted in J.A. 1191, 1192
 
 
 [63]
 MSS Petitioners Reconsideration Order, 4 F.C.C.Rcd at 6032
 
 
 [64]
 Petitioners Globesat and MSSI did not challenge the consortium requirement in the proceedings before the Commission, objecting only to their ultimate exclusion from the consortium
 
 
 [65]
 50 Fed.Reg. at 8156
 
 
 [66]
 Brief of Petitioners/Appellants Global Land Mobile Satellite, Inc. and Globesat Express at 18
 
 
 [67]
 50 Fed.Reg. at 8156
 
 
 [68]
 Id. at 8157
 
 
 [69]
 Id. at 8156-57
 
 
 [70]
 Id. at 8159
 
 
 [71]
 See, e.g., Comments of Omninet Corporation at 35-45, Gen. Docket No. 84-1234 (Apr. 22, 1985), reprinted in J.A. 545-55; Comments of Hughes Communications Mobile Satellite Services, Inc. at 22-26, Gen. Docket No. RM-4247 (Apr. 22, 1985), reprinted in J.A. 462-66
 
 
 [72]
 In 1981, Congress carved out an exception to the hearing requirement, and authorized the Commission to select station licensees through a lottery system. See 47 U.S.C. Sec. 309(i) (1988). The Commission found below, however, that its MSS licensing might not meet the criteria established by Congress for employing a lottery, see H.R. CONF.REP. NO. 765, 97th Cong., 2d Sess. 17, 37 (1982), reprinted in 1982 U.S.CODE CONG. & ADMIN.NEWS 2237, 2261, 2281, and concluded that, because of the risks of administrative cost and delay, "lotteries do not appear to be an acceptable processing alternative." Ownership Rules Order, 2 F.C.C.Rcd at 487
 
 
 [73]
 Although the Commission had approved license consortia in proceedings prior to this one, see NPR, 50 Fed.Reg. at 8156, none of those consortia were subjected to judicial challenge
 
 
 [74]
 Ownership Rules Order, 2 F.C.C.Rcd at 487
 
 
 [75]
 Id
 
 
 [76]
 Since we invalidate the consortium rule itself, we need not address MSSI's separate claim that the Commission acted improperly in rejecting the first consortium agreement reached by nine of the twelve applicants